FILED

2003 OCT 31  P 2: 23

US DISTRICT COURT
BRIDGEPORT CT

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| **QUANTUM SAIL DESIGN GROUP, LLC,** | : |
| | : |
| | : |
| **Plaintiff** | :    **Civil No. 3:03 CV 00281 (WWE)(HBF)** |
| | : |
| **v.** | : |
| | : |
| **LIBERTY ENTERPRISES, INC. d/b/a** | : |
| **QUANTUM EASTERN LONG** | : |
| **ISLAND SOUND, LIBERTY SERVICES LLC,** | : |
| **DEBORAH LIBERTY and SAIL REPAIR** | : |
| **COMPANY** | :    **October 31, 2003** |
| **Defendants.** | : |
| | : |

### PLAINTIFF'S OPPOSITION TO MOTION TO COMPEL DISCOVERY

Plaintiff, Quantum Sail Design Group, LLC ("Quantum") respectfully submits this opposition to the October 8, 2003 Motion for Order Compelling Discovery and Sanctions (the "Discovery Motion") filed by Defendants Liberty Services LLC, Debra Liberty and Sail Repair Company (the "Debra Liberty Defendants").

### BACKGROUND

**A.    The Underlying Judgment.**

On August 16, 2002, Quantum, a leading designer and manufacturer of high performance sails, brought an action in the United States District Court for the District of Connecticut against Liberty Enterprises and its president Billy Liberty. See Quantum Sail Design Group v. Liberty Enterprises, et al., 3:02 CV 01434 (PCD) (the "Quantum Action"). In the Quantum Action,

Quantum sought damages for breaches of a franchise agreement between Liberty Enterprises and Quantum, including the failure of Liberty Enterprises to pay Quantum a debt in excess of $110,000.  Quantum also sought damages for certain unfair business practices conducted by Liberty Enterprises (such as taking deposits from customers for the manufacture of sails but never placing the orders).  On September 26, 2002 the Court granted Quantum's motion for default against Liberty Enterprise and on January 31, 2003, after an evidentiary hearing, the Hon. Peter C. Dorsey awarded Quantum $218,320.74 in damages, $6,500 in attorneys fees and $236.79 in costs.  A copy of the Judgment is attached hereto as **Exh. A.**

**B.**  **Liberty Enterprises Fraudulently Transfers All of Its Assets.**

Liberty Enterprises refused to pay any amount of the January 31 Judgment.  Instead, in an effort to avoid payment of the Judgment, Liberty Enterprises fraudulently transferred all of its assets to Liberty Services, a newly formed company owned by Debra Liberty (the wife of Liberty Enterprises' president Billy Liberty).

On October 16, 2002 – almost one month after the Court in the Quantum Action entered a default against Liberty Enterprises - Liberty Enterprises transferred certain assets of its business (such as machinery and supplies) to Liberty Services.  A copy of the Purchase Agreement documenting this transfer is attached hereto as **Exh. B.**  As Debra Liberty explained in her deposition, in addition to the assets identified in the Purchase Agreement, she purchased essentially all of the equipment and tangible assets of Liberty Enterprises.  See June 19, 2003 deposition of Debra Liberty at 35-38 (excerpts from the deposition of Debra Liberty cited herein are attached as **Exh. C** hereto).

Liberty Enterprises also transferred to Liberty Services a going concern for no consideration. For example, Liberty Services took over Liberty Enterprises' lease, maintained its phone number and took the majority of its customers - all without paying anything to Liberty Enterprises. See D. Liberty Depo. Tr. at 52-53. See also Tr. at 23 (the majority of Liberty Enterprises customers went to Debra Liberty's new business). As Debra Liberty testified, her new company (essentially the "new Liberty Enterprises") generated over $100,000 in income in the first half of 2003. Id. at 60-61.

Finally, Debra Liberty's new company took all of the assets of her husband's company with full knowledge that it owed Quantum a sizeable debt. See D. Liberty Depo Tr. at 61 (Q. "[Y]ou purchased the assets of Liberty Enterprises because Liberty Enterprises had a sizeable debt to Quantum, correct? A. Yes.").

### C.    The Default In This Case.

In this case, Quantum seeks the recovery of the assets fraudulently transferred by Liberty Enterprises pursuant to Connecticut's version of the Uniform Fraudulent Transfers Act ("UFTA"), Conn. Gen. Stat. §§ 52-552a, et seq. (2002). Accordingly, Quantum filed suit against Liberty Enterprises (the debtor/transferor) and also added to this lawsuit Liberty Services LLC, Debra Liberty and Sail Repair Company (i.e., the Debra Liberty Defendants) - the parties that received the assets wrongfully transferred by Liberty Enterprises.

Liberty Enterprises has refused to defend this action and the Court entered a default judgment on July 14, 2003. **Exh D** hereto. Therefore, on July 29, 2003, Quantum filed a motion for order attaching and levying the property that defaulted Liberty Enterprises fraudulently

transferred to the Debra Liberty Defendants. This motion is fully briefed and the parties are awaiting a decision by the Court.

### D.     The Discovery Served By The Debra Liberty Defendants.

On June 30, 2003 – several weeks after Quantum moved to default Liberty Enterprises for failing to defend this action – the Debra Liberty Defendants served on Quantum a broad set of discovery requests. Serving these discovery requests is just another tactic by the husband and wife Liberty team to avoid having to pay the Judgment entered by this Court. On July 30, 2003, Quantum timely filed objections to these discovery requests.

### ARGUMENT

In considering the Discovery Motion, it is important to outline the matters where there is no dispute:

(1)     Liberty Enterprises owes Quantum hundreds of thousands of dollars. See January 31, 2003 Judgment.

(2)     Liberty Enterprises has refused to pay this judgment.

(3)     Liberty Enterprises transferred all of its assets to a newly formed company controlled by Debra Liberty (the wife of Liberty Enterprises' president), and Debra Liberty's new company took the assets of her husband's company with full knowledge that his company owed Quantum a sizeable debt.

(4)     The Debra Liberty Defendants purchased all of the assets of Liberty Enterprises for $11,000.

(5)     Liberty Enterprises has refused to defend this action.

(6)     The Court in this case entered a default judgment against Liberty Enterprises on July 14, 2003.

(7)     Because a default judgment has entered against Liberty Enterprises, Quantum is entitled to an order: (a) voiding the transfer of Liberty Enterprises' assets to the Debra Liberty Defendants; and (b) attaching of all of the assets Liberty Enterprises transferred to the Debra Liberty Defendants (and/or an attachment of the proceeds of the sale of these assets). See Conn. Gen. Stat. § 52-552h.

At this stage of the proceedings, the Debra Liberty Defendants are not entitled to any discovery, as no amount of discovery will change the outcome of this case. First, the Debra Liberty Defendants cannot raise purported "defenses" to whether Liberty Enterprises' transfer of assets was fraudulent. Judge Eginton's Default Judgment against the transferor (Liberty Enterprises) establishes, as a matter of law, that the transfer was fraudulent and voidable. See Conn. Gen. Stat. § 52-552(e) (determination as to whether transfer was fraudulent as to present creditor focuses *exclusively* on the actions and intent of the transferor).

Second, the Debra Liberty Defendants cannot raise any defense to the transfer by claiming that they took the assets in "good faith." As Debra Liberty testified, her new company took all of the assets of her husband's company with full knowledge that it owed Quantum a sizeable debt. See D. Liberty Depo Tr. at 61. In fact, Debra Liberty testified that the money used to purchase Liberty Enterprises' assets came from the proceeds of a home equity loan that had originally been earmarked for paying back the debt her husband's company (Liberty Enterprises) owed Quantum. See D. Liberty Depo Tr. at 43-45. Based on these facts, the "good faith" purchaser defense set forth in Conn. Gen. Stat. § 52-552i is not available here. See Yolen

and Perzin LLC v. Wright, 2003 WL 21499501 at *2 (Conn. Super. 2003) (**Exh. E** hereto) ("in order to prove good faith, the transfer must have occurred in an arms-length bargain, and the transferee must have no intent to, or knowledge of the fact that transaction will, hinder, delay, or defraud others"); cf. Security Pacific v. Canadian Land Co. of Am., N.V., 690 F. Supp. 1214, 1225 (S.D.N.Y. 1988) (denying defendant's motion for discovery related to affirmative defenses where the affirmative defenses lacked factual and legal support).

At most, the Debra Liberty Defendants are left to argue that they are entitled to a "lien" on the assets transferred to them. However, once the fraudulently transferred assets are returned to debtor Liberty Enterprises, the amount of any "lien" that the Debra Liberty Defendants could be entitled is $11,000 – the amount paid by Debra Liberty to her husband for the purchase of all of the assets of Liberty Enterprises. No amount of discovery from Quantum is necessary to determine "the value" paid for the property transferred as this amount is established. See Conn. Gen. Stat. § 52-552i(d)(1) (amount of any lien is "the extent of the value given the debtor . . .").[1]

---

[1]   If the Court were to permit the Debra Liberty Defendants some limited discovery, it would necessarily need to be restricted to the affirmative defenses available to a transferee. The Debra Liberty Defendants are not entitled to relitigate the Quantum Action. Therefore, the interrogatories and requests for production that seek information regarding the Franchise Agreement, the relationship between Quantum and Liberty Enterprises (and its president Billy Liberty) and Liberty Enterprises defaults under the agreement that were the foundation of the Quantum Action are improper. See, e.g., Interrogatory Nos. 3-6, 11-15, 17-20 and Requests for Production Nos. 2-4, 7, 9. Quantum also maintains the other specific objections it has made to the Debra Liberty Defendant's June 30 Discovery Requests.

Accordingly, Quantum respectfully requests that the Debra Liberty Defendants' Discovery Motion be denied.

QUANTUM SAIL DESIGN GROUP, LLC

Timothy A. Diemand (ct 18075)
WIGGIN & DANA LLP
One Century Tower
265 Church Street
New Haven, Connecticut 06508-1832
Tel.: (203) 498-4400
Fax: (203) 782-2889
tdiemand@wiggin.com

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing was served by first class mail, postage prepaid, on 31st day of October, 2003 on the following:


Liberty Enterprises d/b/a Quantum Eastern Long Island Sound
790 Boston Post Road
Westbrook, CT 04498


Richard F. Paladino, Esq.
Gozzi, Paladino & Welsh
23 Sherwood Terrace
Old Saybrook, CT 06457

_____
Timothy A. Diemand


\15786\1\431725.1

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

QUANTUM SAIL DESIGN GROUP, LLC,    :

                                   :

                   **Plaintiff**   :    Civil Action No. 3:02CV01434 (PCD)

                                   :

        v.                         :

                                   :

LIBERTY ENTERPRISES, INC. d/b/a    :
QUANTUM EASTERN LONG               :
ISLAND SOUND and BILLY LIBERTY     :

                                   :

                   **Defendants.** :



## JUDGMENT

AND NOW, this _31st_ day of _January_, 2003, defendant Liberty Enterprises, Inc. d/b/a Quantum Eastern Long Island Sound ("Liberty") having failed to answer or otherwise respond to the Complaint, and after considering the submissions of Plaintiff Quantum Sail Design Group, LLC ("Quantum"), including the evidence presented during the January 21, 2003 hearing, it is hereby:

ORDERED that judgment is entered in favor of plaintiff Quantum against defendant Liberty on Count I of the Complaint, in the amount of $118,320.74.

ORDERED that judgment is entered in favor of plaintiff Quantum against defendant Liberty on Count III of the Complaint, in the amount of $100,000.00.

ORDERED that judgment is entered in favor of plaintiff Quantum against defendant Liberty on Count II of the Complaint, and that defendant Liberty comply with the post-



RECEIVED
FEB 0 3 2003
By_____

termination provisions set forth in the July 2, 1997 Franchise Agreement (the "Agreement") between Quantum and Liberty, including:

    (a)    return to Quantum all proprietary materials;

    (b)    provide Quantum with a complete customer list;

    (c)    retain all records in accordance with the Agreement and permit Quantum to inspect those records;

    (d)    cancel all assumed names and registrations related to Quantum; and

    (e)    cancel all listings indicating that Liberty is affiliated with Quantum.

IT IS FURTHER ORDERED THAT plaintiff Quantum be awarded costs in the amount of _236.79_ and attorneys fees in the amount of _$6,500.00_.

The judgment shall bear interest at the judgment rate until paid.

BY THE COURT:

_____

**UNITED STATES DISTRICT JUDGE**

## PURCHASE AGREEMENT

AGREEMENT made this 16th day of October, 2002 by and between **Liberty Enterprises, Inc.**, ('Seller') with an office at 790 Boston Post Road, Westbrook, CT 06498 and **Liberty Services, LLC** ("Buyer") of East Haddam, CT 06423 Seller and Buyer shall be referred to individually as a 'Party' and collectively as 'the Parties'.

1.  Seller agrees to sell and convey and Buyer agrees to purchase and acquire the furniture, and equipment, any maintenance equipment and any other personalty located on property known as 790 Boston Post Road, Westbrook, CT 06498. See Schedule A for list of all of the above. All the above shall hereinafter be known as" The Property".

2.  Purchase Price and Payment Method. The Purchase Price which Buyer agrees to pay and Seller agrees to accept for the above described assets is the sum of ELEVEN THOUSAND and 00/100 DOLLARS ($11,000.00), payable as follows:

    A.      Deposit received by Buyer to Seller, by check, $ 1,000 .00

    B.      Additional deposit by Buyer to Seller, bu check, $2,500.00

    C.      Balance by local bank cashier's check, or attorney's trust fund check drawn to Seller's order $7,500.00

    TOTAL $ 11,000

3.  Contract Date; Time for Acceptance. The date upon which this Agreement has been executed by the last Party shall be 'the Contract Date.' If this Agreement shall not have been executed by all Parties on or before October 10, 2002, the proposed transaction shall terminate automatically.

4. Closing. The Closing for payment of the Purchase Price to Seller shall take place at 1:00 pm on October 14, 2002 at the office Attorney Alexander W. Tighe, 12 Old Boston Post Road, Old Saybrook, CT 06475.

5. Broker. Each of the Parties represents and warrants to the other that neither Party dealt with, negotiated through or communicated with any broker in connection with this transaction. Buyer and Seller hereby indemnify, defend and hold the other harmless from and against any and all claims, loss, liability, costs and expenses, including reasonable counsel fees, resulting from any claims that may be made against the other by any broker or other person a commission, fee or other compensation by or on account of any act if the same shall arise by, through or on account of any act of the

indemnifying Party, its agents or employees. The provisions of this paragraph shall survive the Closing.

7 .Condition of the Property. Buyer expressly acknowledges and agrees to accept The Property at Closing in good operating condition as it was on August 1, 2002 reasonable wear and tear excepted, as of the Closing Date, subject to the provisions of Paragraph 8.

8. Closing Documents.

A. At the Closing, Seller shall deliver to Buyer the a Bill of Sale Absolute (with warranties, but excluding warranties as to the IRS lien) covering the applicable personalty;

B. At the Closing. Buyer shall deliver to Seller the following:

(1) A local bank cashier's check or attorney's trust fund check in the sum of SEVEN THOUSAND FIVE HUNDRED AND 00/100 DOLLARS ($7,500.00) payable to Seller.

C. At the Closing, the Parties shall mutually execute and deliver to each other a Closing Statement in customary form and such other and further documents as reasonably may be required to carry out the purposes of this Agreement.

9. Seller's Representations and Warranties. Seller hereby makes the following representations and warranties to Buyer:

A. At Closing, The Property shall be free and clear of all liens, security interests, restrictions, and other encumbrances, **except a lien in favor of the Internal Revenue Service.**

B. Seller's consummation of the subject transaction will not violate any commitment or obligation by Seller to any other person or entity regarding the sale of the Property to any other person or entity other than Buyer.

C. Seller has all requisite power and authority to execute and deliver this Agreement and to carry out its obligations hereunder and the transactions contemplated hereby. This Agreement has been, and the documents contemplated hereby will be, duly executed and delivered by Seller and constitute its legal, valid and binding obligation enforceable against it in accordance with its terms. The consummation by Seller of the sale of the Property is not a violation of or conflict with, nor does it constitute a default under any term or provision of, the organizational documents of Seller or any of the terms of any agreement or instrument to which it is a party, or by which it is bound. or of any provision of applicable law, ordinance, rule or regulation of any governmental authority or of any provision of any applicable order, Judgment or decree of any court, arbitrator or governmental authority other than as has herein been disclosed.

D. To the best of Seller's knowledge and belief, all of the information concerning Seller and the Property provided to Buyer by Seller and all reports, contracts or other items delivered by Seller pursuant to this Agreement are true, complete and correct in all material respects and fairly present the information set forth in a manner that is not misleading.

E. Other than in the ordinary course of business, Seller shall not remove any of The Property from the Premises without Buyer's prior written consent.

F. To the best of Seller's knowledge and belief, Seller warrants that all of the representations contained herein are true and correct and will be true and correct as of the Closing Date.

10. <u>Buyer's Representations and Warranties.</u> Buyer hereby makes the following representations and warranties to Seller:

A. Buyer has all requisite power and authority to execute and deliver this Agreement and to carry out its Obligations hereunder and the transaction contemplated hereby. This Agreement has been, and the documents contemplated hereby will be, duly executed and delivered by Buyer and constitute its legal, valid and binding obligation enforceable against it in I accordance with its terms. The consummation by Buyer of the sale of the Property is not a violation of or conflict with, nor does it constitute a default under any term or provision of, the organizational documents of Buyer or any of the terms of any agreement or instrument to which it is a party, or by which it is bound, or of any provision of applicable law, ordinance, rule or regulation of any governmental authority or of any provision of any applicable order, judgment or decree of any court, arbitrator or governmental authority.

B. Buyer shall promptly notify Seller of any material change in any condition with respect to any material event or condition which makes any representation or warranty by Buyer to Seller under this Agreement untrue, misleading or incomplete, or any covenant of Seller under this Agreement incapable or less likely of being performed; it being understood that Buyer's obligation to provide notice to Seller under this Section shall in no way relieve Buyer of any liability for a breach by Buyer of any of its representations, warranties or covenants under this Agreement.

C. To the best of Buyer's knowledge and belief. Buyer warrants that all of the representations contained herein are true and correct.

11 <u>Default</u> If Buyer shall fail to perform any of the covenants of this Agreement within the time specified, the Deposit this date paid by Buyer, and all interest thereon, may be retained by or for Seller's account as liquidated damages for the execution of this Agreement and in full settlement of any claims for damages and all Parties shall be relieved of all obligations under this Agreement, and each Party shall execute a separate release of the other Party at that time. If Seller shall fail to perform any of the covenants of this Agreement, other than Seller's failure to deliver marketable title after diligent effort, the aforesaid Deposit, and all interest thereon, shall be returned to Buyer on demand and all parties shall be released from liability under this Agreement.

12. <u>Assignment.</u> Buyer may assign this Agreement to an affiliate of Buyer with Seller's prior consent, which consent shall not be unreasonably withheld.

13. <u>Notices.</u> Unless otherwise specified herein, all notices and other communications to be made hereunder shall be in writing and shall be deemed given when mailed by registered or certified mail, return receipt requested, postage prepaid and addressed:

If to Seller:          Liberty Enterprises, Inc.
                       Boston Post Road
                       Westbrook, CT 06498


with a copy to:        Marina Lee, Esq.
                       Lee and Associates, LLC
                       29 Elm Street
                       Old Saybrook, CT 06475


If to Buyer:           Liberty Services, LLC
                       23 Brookhill Road
                       East Haddam, CT 06423


with a copy to:        Alexander W. Tighe, Esq.
                       12 Old Boston Post Road
                       Old Saybrook, CT 06475


Either Party may, by notice duly given hereunder, designate different addresses for notices or other communications intended for it.

15. <u>Successors and Assigns.</u> The provisions of this Agreement shall be binding upon and inure to the benefit of Seller and Buyer, and their respective heirs, legal representatives, successors and assigns.

16. <u>Governing Law</u> This Agreement shall be construed in accordance with land governed by the laws of the State of Connecticut. The Parties hereby agree that venue for any legal action arising out of this Agreement shall be Middlesex County, Connecticut.

17 .<u>Attorney's Fees.</u> In connection with any litigation, including appellate proceedings arising out of this Agreement, the prevailing Party shall be entitled to recover reasonable attorneys' fees and costs.

18. <u>Interpretation; Severability.</u> This Agreement has been reviewed and negotiated by both Parties and shall be construed in accordance with its expressed or implied intent without regard to the party initially preparing the document. In the event that any of the clauses or provisions of this Agreement hereby operate or prospectively operate to invalidate this Agreement, in whole or in part, then only such clause or provision shall be construed invalid and inoperative and the remainder of this Agreement shall continue operative and in full force and effect.

19. <u>Entire Agreement</u> This Agreement represents the entire understanding of the Parties, and all prior negotiations and agreements concerning the purchase and sale of the Property are merged herein. This Agreement may not be amended, modified, altered, or changed in any respect whatsoever, except by further agreement in writing, duly executed by the Parties hereto, or their successors or assigns, as the case may be.

20. <u>Not Included In Transaction</u> This transaction does not include the purchase or sale of receivables, inventory, trade name or good will.

IN WITNESS WHEREOF, the Parties hereto have hereunto affixed their hands and seals on the dates hereinafter set forth.

Signed, sealed and delivered
in the presence of:


_____     10/16/2002
Liberty Enterprises, Inc. by its President,     Date
William Liberty (SELLER)


_____     10/16/02
Liberty Services, LLC, by its member     Date
Deborah Liberty (BUYER)

# SCHEDULE A
# LIBERTY ENTERPRISES, INC.

1.  2 - DNU 241 Walking foot w/reverse @$400.00 ea.     $ 800.00

2.  ConSay 225 Walking foot – no reverse     $ 250.00

3.  Singer 491 – simple needle     $ 225.00

4.  Singer 831 – Overlook Machine     $ 375.00

5.  US Blindstitch 718     $ 300.00

6.  107 Singer Zig Zag w/puller     $ 500.00

7.  Adler 166 Long Arm     $2500.00

1

# BILL OF SALE

Liberty Enterprises, Inc. located at 790 Boston Post Road, Westbrook, Connecticut for good and valuable consideration paid by Liberty Services, LLC, located at 23 Brooke Hill Road, East Haddam, Connecticut (hereinafter "Buyer") receipt of which is hereby acknowledged, does hereby transfer all right, title and interest to the equipment described in Exhibit A attached hereto.

Buyer shall have all rights and title to the goods in itself and its assigns.

Seller, by execution of this Bill of Sale, transfers all right, title and interest to the equipment listed thereon. Seller does not make any warranties with respect to the delivery, location, use or condition of said items, inventory, furniture and equipment except as stated herein. Buyer acknowledges it is taking title to the herein stated goods "AS IS, WHERE IS".

SELLER WARRANTS THAT IT HAS GOOD AND MERCHANTABLE TITLE TO THE GOODS DESCRIBED HEREIN, HOWEVER, SELLER MAKES NO WARRANTIES EXPRESS OR IMPLIED, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

All costs of transfer or delivery of the equipment including any applicable sales or use tax, shall be the responsibility of the Buyer.

IN WITNESS WHEREOF, Seller has executed this Bill of Sale on October 16th, 2002.

Liberty Enterprises, Inc.

BY: William Liberty
Its President

STATE OF CONNECTICUT     )
                         ) SS: OLD SAYBROOK     October 16th, 2002
COUNTY OF MIDDLESEX       )

The foregoing instrument was acknowledged before me and proof was given that William Liberty holds the position of Member with Liberty Enterprises, Inc. this 16th day of October, 2002.

_____
Commissioner of the Superior Court

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - x
                                   :
QUANTUM SAIL DESIGN GROUP, LLC,
                                   :
            Plaintiff,
                                   : Civil Action
      vs.
                                   : No. 3:03
LIBERTY ENTERPRISES, INC. d/b/a      CV-00281 (WWE)
QUANTUM EASTERN LONG ISLAND SOUND, :
LIBERTY SERVICES, LLC, DEBRA
LIBERTY, AND SAIL REPAIR COMPANY,  :

            Defendants.            :

- - - - - - - - - - - - - - - - - x


            Deposition of DEBRA L. LIBERTY, taken

      pursuant to the Federal Rules of Civil

      Procedure, at the law offices of Gozzi,

      Paladino & Welsh, 49 Sherwood Terrace, Old

      Saybrook, Connecticut, before Frances L.

      Doran, License No. 00192, Notary Public in

      and for the State of Connecticut, on Friday,

      June 19, 2003, at 10:05 a.m.


            *Scribes, Inc.*

445 George Street   New Haven, Connecticut 06511

New Haven: (203) 785-8795    1-800-SCRIBES • FAX: (203) 785-9132

1    Q.    Would you have a sense of how many?

2    A.    No.

3    Q.    Would it be more than 10?

4    A.    Yes.

5    Q.    Would it be more than 25?

6    A.    It would probably be all of them except the

7    ones that we lost from the letter.

8    Q.    And so as best as you can tell, the majority

9    of Liberty Enterprises' customers came with you to

10   Liberty Services?

11   A.    Yes.

12   Q.    What type of advertising does Liberty

13   Services do?

14   A.    None.

15   Q.    Okay.  Do you have any listing in the phone

16   book?

17   A.    Yes.

18   Q.    And what is your phone book listing?

19   A.    The Sail Repair and Canvas Company.

20   Q.    Just so I understand, if I look in the Yellow

21   Pages, it doesn't say Liberty Services?

22   A.    No.

23   Q.    Why does it have a different name?

24   A.    Because as Liberty Services nobody would know

25   what that is, so if it says the Sail Repair Company and

1           (Pause in the proceedings)

2       Q.    Miss Liberty, I put in front of you something

3   that's contained in Exhibit 2, and it's entitled

4   Purchase Agreement dated October 16, 2002 between

5   Liberty Enterprises and Liberty Services.  My first

6   question is what is the business address of Liberty

7   services?

8       A.    790 Boston Post Road in Westbrook.

9       Q.    Does Liberty Services have a second address?

10      A.    No.

11      Q.    Again, my question is in the first paragraph

12  it talks about Liberty Services in East Haddam,

13  Connecticut.

14      A.    That's my home address.

15      Q.    Okay.  What is your home address?

16      A.    East Haddam, Connecticut.

17      Q.    The street?

18      A.    23 Brook Hill Road.

19      Q.    And am I correct in understanding that what

20  that document is is your company's purchasing some of

21  the assets of Liberty Enterprises; is that correct?

22      A.    Yes.

23      Q.    And the Purchase Agreement details all of the

24  assets that you bought from Liberty Enterprises?

25      A.    Yes.

1    Q.    And where is that?

2    A.    It would be in the appraisals.

3    Q.    That's my question.  If you take a look at

4    Paragraph 1 of the Purchase Agreement, it talks about

5    Schedule A as listing all of the property that you're

6    buying.  Do you see that?

7    A.    Where?

8    Q.    Under Paragraph 1.

9    A.    Uh-huh.

10   Q.    I'll read it.  "Seller agrees to sell and

11   convey, and Buyer agrees to purchase and acquire the

12   furniture and equipment, maintenance equipment and

13   other personal property located at 790 Boston Post

14   Road.  See Schedule A for a listing of all above."

15   A.    Uh-huh.

16   Q.    And I want you to take a look at Schedule A

17   to the Purchase Agreement.

18   A.    Okay.

19   Q.    And do you see seven things listed?

20   A.    Uh-huh.

21   Q.    Are those the seven things that you purchased

22   from Liberty Enterprises?

23   A.    Yeah.

24   Q.    Did you purchase anything else from Liberty

25   Enterprises?

37

1      A.   Hardware and inventory.

2      Q.   And that's not listed on Schedule A?

3      A.   No.

4      Q.   Do you know why?

5      A.   No.

6      Q.   Looking at Schedule A, those are seven items;

7  correct?

8      A.   Yes.

9      Q.   And what are those seven things?

10     A.   Sewing machines.

11     Q.   Those are all just different types of sewing

12 machines?

13     A.   Uh-huh.

14          MR. PALADINO:  You should answer yes or

15          no so she can get it down.

16     A.   Yes.

17     Q.   Okay.  So this Schedule A just shows that

18 you're purchasing some sewing machines; correct?

19     A.   Yes.

20     Q.   What would I need to look at to see all the

21 other stuff that you bought from Liberty Enterprises?

22     A.   The appraisals.

23     Q.   When you say "the appraisals," do you have

24 those in the package where you can point them out to

25 me?

1    A.    Yes.

2    Q.    Okay.

3    A.    Right here.

4    Q.    So you're talking about the appraisal that

5    Brian Carrigan put together?

6    A.    Uh-huh.

7    Q.    Is that a complete inventory of all of the

8    property that you purchased from Liberty Enterprises?

9    A.    Yes.

10    Q.    That's everything?

11    A.    Yes.

12    Q.    Who is Brian Carrigan?

13    A.    He was the owner of a similar type business

14    that had to close his doors down a few years ago.

15    Q.    How long have you known Brian?

16    A.    Maybe eight, nine years.

17    Q.    And do you know how long your husband knew

18    Brian?

19    A.    Probably about the same.

20    Q.    Are you guys friends?

21    A.    We knew each other.  We didn't socialize.

22    Q.    And did you work together with Brian?

23    A.    No.

24    Q.    How about John O'Neil?

25    A.    Another local sailmaker that had to close his

1    check, the $1,000 check?

2        A.   My personal account.

3        Q.   Where did the funds come from for your second

4    check, the $2,500 check?

5        A.   My personal account.

6        Q.   The third check in the amount of, I think

7    it's $5,000, where did those funds come from?

8        A.   From the new business account.

9        Q.   And that business had just got up and

10   running.  How did $5,000 get into Liberty Services'

11   bank account?

12        A.   I started the business with a lump sum of

13   money.

14        Q.   And where did that lump sum of money come

15   from?

16        A.   I took a mortgage out on my house.

17        Q.   How much did you take out to establish the

18   business?

19        A.   To establish the business?

20        Q.   Yeah.  How much did you take out from your

21   home, equity from your house to get Liberty Services up

22   and running?

23        A.   $30,000.

24        Q.   And so then the fourth check which is the

25   $2,500, does that come out of Liberty Services' bank

1    account?

2        A.    Uh-huh.

3        Q.    Is that yes?

4        A.    Yeah.

5        Q.    And, again, was that money that was from the

6    home equity on the house?

7        A.    Yes.

8        Q.    Do you maintain a joint checking account with

9    Billy Liberty?

10       A.    No.

11       Q.    Who has title to your home?

12       A.    I do.

13       Q.    Does anybody else have an interest in the

14   house technically?

15       A.    No.

16       Q.    Are there any liens on the house?

17       A.    No.

18       Q.    When did you purchase the house?

19       A.    Hang on a second.   '96.

20       Q.    And how much did you pay for it?

21       A.    $145,000.

22       Q.    How much is it worth today?

23           MR. PALADINO:  If you know.

24       A.    About $225,000.

25       Q.    And how much -- what's the mortgage that you

1     have, all mortgages first, second, et cetera, on the

2     house?

3          A.    What do you mean?

4          Q.    How much do you owe on the house?

5          A.    I owe $160,000.

6          Q.    And that includes the $30,000 line that you

7     took out to establish Liberty Services; correct?

8          A.    Yes.

9                MR. PALADINO:  I'm not sure she said it

10               was a line.

11         Q.    I'm sorry.  Whatever it was.  Was a second

12    mortgage taken out?

13         A.    Second mortgage.

14         Q.    Okay, thank you.  And when did you take that

15    second mortgage out on the house?

16               MR. PALADINO:  If you know.

17         A.    I want to say it was July of 2002.

18         Q.    And the purpose of taking it out in July of

19    2002?

20               MR. PALADINO:  Didn't we go there?

21         A.    The original intent was to loan the money to

22    my husband because he owed his franchisor some money.

23         Q.    And then what happened?  Why didn't that

24    money go to Mr. Liberty?

25         A.    Why didn't it go to him?  He was terminated,

1      things.

2          Q.    Do you know if you just provided a number to

3      Dennis or was there a detailed account of what's in the

4      building?

5          A.    He came by and looked at it, so --

6          Q.    Did you pay anything to Liberty Enterprises

7      to take over the lease of the property on the Post

8      Road?

9          A.    No.

10         Q.    Did you pay anything to Liberty Enterprises

11     to get their old phone number, the 399-0077 number?

12         A.    No.

13         Q.    Did you pay anything to Liberty Enterprises

14     to get the customer list?

15         A.    No.

16         Q.    When you took over the business in September,

17     October of 2002, was there any work in progress, any

18     repair work in progress that Liberty Enterprises was

19     working on that Liberty Services finished up?

20         A.    No.

21         Q.    Did you pay anything to Liberty Enterprises

22     for any good will?

23         A.    No.

24         Q.    Did you pay anything to Liberty Enterprises

25     for taking over a going concern?

1      A.    No.

2      Q.    So the only amount of money that you paid

3  Liberty Enterprises was the $11,000 for some equipment

4  that's reflected in the October 2002 Purchase

5  Agreement; is that correct?

6      A.    Only assets, yes.

7      Q.    In the appraisal documents, Miss Liberty,

8  that you provided to us --

9      A.    Uh-huh.

10     Q.    -- there's an appraisal dated January 7, 2003

11  from Mr. John O'Neil.

12     A.    Yes.

13     Q.    In you could just take a look at that,

14  please.  Do you have that in front of you?  It's a

15  January 7, 2003 appraisal from John O'Neil.

16     A.    Yes.

17     Q.    Why did you get this appraisal?

18     A.    The trustee in the Bankruptcy Court had asked

19  for a third appraisal.

20     Q.    Was Liberty Enterprises in bankruptcy?

21     A.    No.

22     Q.    As far as you know, did Liberty Enterprises

23  own all of the assets that you purchased for $11,000?

24     A.    Yes.

25     Q.    Those were not owned individually by

1    reflect?

2         A.    The purchase of the assets.

3         Q.    Purchase of what assets?

4         A.    From Liberty Enterprises.

5         Q.    But I thought the Purchase Agreement was for

6    $11,000?

7         A.    Two checks.  It came out of my personal

8    account.  These are the checks that add up to $9,000

9    that came from Liberty Services.

10        Q.    How do you account for the personal checks

11   that came out of your personal account?

12        A.    From the second mortgage on the house.

13        Q.    But is that treated as a loan to Liberty

14   Services the company?

15        A.    Yes, it is.

16        Q.    How much is Mr. Liberty paid a month for his

17   consulting services?

18        A.    $2,000.

19        Q.    Do you have a profit and loss statement from

20   January -- I mean, the first quarter of '03?

21        A.    No, I don't.

22        Q.    Do you know how much your total income was

23   first quarter '03?

24        A.    No, I don't.

25        Q.    Can you give me an approximation?

1    A.    Yes, 38.

2    Q.    And that's for January through March of '03?

3    A.    Yes.

4    Q.    Now, I know June is not over, but taking

5    April through -- April of '03 through today, how much

6    income for the company?

7    A.    I don't know.

8    Q.    Approximately?

9    A.    I haven't done my sales tax yet.  Maybe

10    $70,000.

11    Q.    And the reason for the almost doubling?

12    A.    Seasonal.

13    Q.    Seasonal business, okay.  Does that mean that

14    in -- well, if the weather seems like it will never get

15    better, but when the weather gets better, you're doing

16    more canvas and repair work?  Is that how it works?

17    A.    Yes.

18    Q.    And I think we already talked about this.

19    Just a few more questions.  I think you had said that

20    you purchased the assets of Liberty Enterprises because

21    Liberty Enterprises had a sizable debt to Quantum;

22    correct?

23    A.    Yes.

24    Q.    And did you know that in August of 2002

25    Quantum had sued Liberty Enterprises to collect this

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

FILED

2003 JUN 18 P 3: 20

US D...

---

QUANTUM SAIL DESIGN GROUP, LLC,       :

                Plaintiff       :       Civil No. 3:03 CV 00281 (WWE)

        v.       :

LIBERTY ENTERPRISES, INC. d/b/a       :
QUANTUM EASTERN LONG       :
ISLAND SOUND, LIBERTY SERVICES LLC,  :
DEBORAH LIBERTY and SAIL REPAIR       :
COMPANY       :       June 18, 2003
              Defendants.       :

---

## MOTION FOR DEFAULT JUDGMENT

Plaintiff, Quantum Sail Design Group, LLC ("Quantum") respectfully moves this Court, pursuant to Fed. R. Civ. P. 55(b)(2), to enter judgment by default against Defendant Liberty Enterprises, Inc. d/b/a/ Quant[um] d ("Liberty Enterprises") and requests the relief detailed below.

The Court should enter [...] se:

1.    Liberty Enterpri[ses] [owed Quantum] over $200,000. This debt was confirmed by a January 31, 2003 Judgment entered by the Hon. Peter Dorsey. In an effort to avoid paying the debt owed to Quantum, Liberty Enterprises (a company controlled by Mr. Billy Liberty) transferred assets to companies controlled by Mr. Liberty's wife. Therefore, Quantum was forced to undertake the burden and expense of initiating this action.

2.    On February 14, 2003, Quantum filed its complaint. The complaint, brought under Connecticut's version of the Uniform Fraudulent Transfers Act, Conn. Gen. Stat. §§ 52-552a et seq. (2002) and/or the common law, seeks to set aside fraudulent transfers from

**\*21499501**    Only the Westlaw citation is currently available.

UNPUBLISHED OPINION.    CHECK COURT RULES BEFORE CITING.

Superior Court of Connecticut,
Judicial District of New Britain.

YOLEN AND PERZIN, L.L.C.,
v.
Nannette H. WRIGHT et al.

No. CV020514379S.
May 19, 2003.

Yolen & Perzin LLC, New Haven, for Yolen & Perzin LLC.

Hamzy & Conlin LLC, Bristol, for Committee.

Nannette H. Wright, Simsbury, pro se.

Samuel Feldman, West Hartford, Community Law Practice LLC, Hartford, for Nannette H. Wright.

David B. Wright, Simsbury, pro se.

Samuel Feldman, West Hartford, for David B. Wright.

Ann Coonley, New Haven, for Ann P. Coonley.

VANESSA L. BRYANT, P.J.

**\*\*1** This is an action seeking first an order voiding the transfer by the defendant, Nannette H. Wright (formerly Nannette Brossy), of her interest in her residence known as 15 Clifdon Drive, Simsbury, Connecticut (the property) to her present husband David B. Wright; and second, a judgment of foreclosure by sale of the premises by virtue of a judgment lien filed by the plaintiff on the property. Exhibits 1, 2, 18 and 19. The matter was tried to the court on various days ending April 3, 2003. The plaintiff claims that it is entitled to an order voiding the transfer of the property because the defendant Nannette Wright transferred the property in violation of the Fraudulent Transfer Act General Statutes, § 52-552 et seq.

A claim of fraudulent transfer must be shown by clear, precise and unequivocal evidence. *Tyers v. Coma,* 214 Conn. 8, 11 (1990); *Tessitore v. Tessitore,* 31 Conn.App. 40, 623 A.2d 496 (1993). The court finds that the following facts prove by clear, precise, convincing and unequivocal evidence that a voidable fraudulent transfer occurred as claimed by the plaintiffs.

By way of background, this case emanates from a custody proceeding in the Regional Family Trial Docket in the custody case of *Brossy v. Brossy* Docket No. FA 94-0365430S. In which Yolen and Perzin was named counsel for the minor children of Nannette Wright and Ann P. Coonley was named guardian ad litem for the children. The parents of the children were responsible for paying the fees incurred for these services. While the proceedings were ongoing and the plaintiff was providing services to the children, on July 26, 2000 Nannette Wright "for no consideration grant[ed] to David B. Wright [the co-defendant] ... all of [her ... rights, title and interest in and to ... 15 Clifdon Drive Simsbury, Connecticut." Exhibit 13. At all relevant times prior to and after she transferred her interest in the property, Nannette Wright and the Brossy children have lived on the property and continue to do so. The plaintiffs introduced into evidence which showed that the transfer was made while Nannette Wright had debts in excess or her assets. That evidence consisted of affidavits filed by Nannette Wright in the custody proceedings and establish the following additional fads be clear, convincing and unequivocal evidence. The affidavits are dated March 29, 1997, May 2, 1997, November 21, 1997, January 12, 1998, February 11, 1998, February 3, 2000, November 24, 2000, February 26, 2001 and the last one was undated. Exhibits 3-11. They show that Nannette Wright had a 50% interest in property, her liabilities exceeded her assets, and the value of the property exceeded the debt secured by the property. *Id.* In signing the affidavit she certified that the statements made in the affidavit were true and accurate to the best of her knowledge and belief. *Id.* During the time these affidavits were filed, this court (Pickard, J.) entered an order dated January 26, 2001 in the custody case ordering Nannette Wright to pay 50% of the fees for legal and guardian ad litem services rendered to the Brossy children. Exhibit 15. The judgments were never satisfied and the amounts remain due and owing. The plaintiffs filed judgment liens on the property to secure the payment of the judgments and discovered the property had been transferred by Nannette to David and commenced this action seeking an order voiding the transfer and foreclosing the judgment lien.

**\*\*2** The court finds that judgments, inclusive of accrued interest owing to Yolen and Perzin is

© 2003 West, a Thomson business. No claim to original U.S. Govt. works.

2003 WL 21499501, Yolen and Perzin, L.L.C. v. Wright, (Conn.Super. 2003)                    **Page 2**

$34,345.03 and judgments, inclusive of interest owed to Ann P. Coonley P.C. equals $22,234.90. Exhibit 21. The property is worth $350,00 as evidenced by an appraisal. Exhibit 12.

A transfer made by a debtor is fraudulent as to a creditor, if the creditor's claim arose before the transfer was made and if the debtor made the transfer either with actual intent to hinder, delay or defraud any creditor of the debtor or without receiving a reasonably equivalent value in exchange for the transfer and the debtor was in or about to engage in a transaction for which the remaining assets of the debtor were unreasonably small in relation to the transaction or where the transferor intended to incur or reasonably should have believed that she would incur debts beyond her ability to pay as they became due. General Statutes § 52-552e(a). In determining whether actual intent existed, the court may consider among other things whether the debtor retained possession and control of the property transferred after the transfer, whether the transfer was concealed, whether the debtor had been sued or was threatened with suit prior to the transfer, whether the transfer consisted of substantially all the debtor's assets, whether the debtor moved or concealed assets, the value or consideration received by the debtor and whether the transfer occurred shortly before or shortly after the substantial debt was incurred. General Statutes § 52-552e(b). At the time of the transfer Nannette Wright was engaged in a protracted custody battle involving disputes over parental rights and responsibilities, including the responsibility to pay legal and guardian ad litem fees incurred to represent the Brossy children's interests in the case. Accordingly, Nannette Wright transferred her interest in the property without consideration or equivalent value at a time when she was engaged in a dispute which she knew or should have known would result in the incurrence of legal and other fees and expenses on behalf of her children for which she was jointly and severally liable, absent a contrary ruling of the court.

In addition, the court finds that Nannette had actual intent to hinder, delay and defraud creditors. She retained possession and control of the property after the transfer, the transfer was concealed from the court and the attorneys and guardian ad litem for the children by repeatedly filing false financial affidavits after the date of the transfer listing an interest in the property. The transfer was made while the debts to the plaintiffs were being incurred, the transfer consisted of substantially all of Nannette Wright's assets, finally, Nannette Wright received no consideration or other value whatsoever for the transfer.

In an action for relief against a transfer under Section 52-552e of the General Statutes, a creditor may obtain avoidance of the transfer to the extent necessary to satisfy the creditor's claim, subject to statutory defenses, none of which have been claimed by the defendants. General Statutes § 52-552h. Even if Mr. Wright claimed a defense, there is no evidence to support a claim that the transfer was made upon the default of leases or that Mr. Wright gave value in consideration for the transfer. Genera! Statutes § 52-552i. A transferee acting in good faith has a statutory defense to a fraudulent transfer claim. The Uniform Fraudulent Transfer Act as adopted in Connecticut does not define the term good faith, however, fraudulent transfer is a subject which is well developed in bankruptcy law where, in order to prove good faith, the transfer must have occurred in an arms-length bargain, and the transferee must have no intent to, or knowledge of the fact that transaction will, hinder, delay, or defraud others. Bankruptcy Code, 11 U.S.C.A. § 548(c). *In re Colonial Realty Co.,* 210 B.R. 921 (1997). David Wright is not entitled to rely on the good faith defense as he admitted that knew his wife was insolvent at the time of the transfer and was also incurring legal and guardian ad litem expenses on behalf of her children. Whether a transferee acted in bad faith is a question of fact for the trier of fact. *Zapolsky v.. Sacks,* 191 Conn. 194 (1983).

**\*\*3.** In an action for relief against a transfer as this is subdivision (1) of subsection (a) of Section 52-552h of the General Statutes, empowers a court to render judgment for the creditor equal to the value of the asset transferred, as adjusted under subsection (d) of Section 52-552i of the General Statutes or the amount necessary to satisfy the creditor's claim whichever is less. The creditor is also entitled to a lien on the assets of the transferee, an injunction against further transfers or other equitable relief. *Id.* The judgment may be rendered against the first transferee of the asset or the person for whose benefit the transfer was made. General Statutes § 52-552i(b). A fraudulent transferee is required to forfeit that which he wrongfully obtained via the fraudulent transfer. *Litchfleld Asset Management Corp. v. Howell,* 70 Conn.App. 133, 799 A.2d 298 (2002).

Nannette Wright's transfer of her 50% interest in the property known as 15 Clifdon Drive Simsbury, Connecticut is voided. The court finds the total debt to be $34,345.03. The court orders a foreclosure by sale to occur on Saturday, August 2, 2003, notice of

© 2003 West, a Thomson business. No claim to original U.S. Govt. works.

2003 WL 21499501, Yolen and Perzin, L.L.C. v. Wright, (Conn.Super. 2003)

Page 3

the sale is to be published in the *Hartford Courant* on Sunday July 20, 2003 and July 27, 2003.  The court awards an appraisal fee of $300.00.  The sale is to be conducted in accordance with the standing order of the court pertaining to foreclosures sale in the New Britain Judicial District.

© 2003 West, a Thomson business. No claim to original U.S. Govt. works.